**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PATRICIA B., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 22 C 1280 |
| v. ) | |
| ) | Magistrate Judge Finnegan |
| MARTIN J. O'MALLEY, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Patricia B. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision. After careful review of the record and the parties' respective arguments, the Court finds that the case must be remanded for further proceedings.

## BACKGROUND

Plaintiff protectively applied for DIB and SSI on October 7, 2020, alleging in both applications that she became disabled on September 12, 2020 due to degenerative disc

---

[1] Martin J. O'Malley became the Commissioner of Social Security on December 20, 2023. He is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

disease, spinal stenosis, arthritis, tendonitis, and nerve damage. (R. 13, 216-37, 258-59). Born in 1966, Plaintiff was 54 years old as of the alleged disability onset date, making her a person closely approaching advanced age (age 50-54). (R. 216-21); 20 C.F.R. § 404.1563(d); 20 C.F.R. § 416.963(d). She completed two years of college and has a Certified Nursing Assistant certification, and she lives in a house with her boyfriend, who moved in because she needs help. (R. 20, 41, 260, 284). Plaintiff worked as a gastrointestinal technician for over twenty years but became unable to continue working due to arthritis pain, stenosis, neuropathy in her cervical spine, degenerative disc disease, and herniated discs in September 2020. (R. 20, 42-44, 52, 272, 284). She has not engaged in any substantial gainful activity since the alleged onset date. (R. 15).[2]

The Social Security Administration denied Plaintiff's DIB and SSI applications initially on February 18, 2021 and again upon reconsideration on May 14, 2021. (R. 13, 57-123). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Lana Johnson (the "ALJ") on October 28, 2021.[3] (R. 13, 139-55). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert John Pullman (the "VE"). (R. 13, 35-56). On November 24, 2021, the ALJ found that Plaintiff has severe impairments in the form of degenerative disc disease of the cervical spine, "degenerative disc disease of the lumbar spine status post L5-S1 fusion," and "left carpal tunnel syndrome (CTS) and ulnar neuropathy status post ulnar nerve compression surgery," as well as non-severe impairments in the form of hypertension,

---

[2] Plaintiff's certified earnings record shows $16,624 in substantial gainful activity level income for 2020 and no income for 2021. (R. 15-16, 242-43). The substantial gainful activity threshold is $15,120. However, because Plaintiff's alleged onset date is September 12, 2020, income through the first three quarters of the year is pre-onset date, and only $1,320 was reported for the fourth quarter. (R. 15-16, 242).

[3] The hearing was held telephonically due to the COVID-19 pandemic. (R. 13, 37-39, 158-82).

2

hypothyroidism, and depression, but they do not alone or in combination meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16-17, 29).

After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except she can: never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, kneel, crouch, and crawl; and frequently handle and finger bilaterally. (R. 20). The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could perform Plaintiff's past relevant work as a medical assistant (as generally performed but not as actually performed). (R. 28, 52). As a result, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the September 12, 2020 alleged disability onset date through the ALJ's November 24, 2021 decision. (R. 28-29). The Appeals Council denied Plaintiff's request for review. (R. 1-6). The ALJ's decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff contends that the ALJ: (1) improperly discounted her subjective statements regarding her symptoms; (2) failed to account for the combined effects of her pain and depression in the RFC assessment; and (3) improperly relied on the VE's testimony that she could perform her past work. As discussed below, the Court finds that remand is necessary because in discounting Plaintiff's statements regarding her neck and back pain and determining her functional

3

limitations, the ALJ improperly relied on the results of an MRI test without appropriate medical input.

## DISCUSSION

**A.     Standard of Review**

A claimant is disabled within the meaning of the Social Security Act if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[4] 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether [the claimant] has a severe impairment or a combination of impairments that is severe; (3) whether [the claimant's] impairments meet or equal any impairments listed as conclusively disabling; (4) whether [the claimant] can perform . . . past work; and (5) whether [the claimant] is capable of performing any work in the national economy." *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021) (citing (citing 20 C.F.R. § 404.1520(a)-(g)). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Id*.

In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) (quoting *Gedatus*, 994 F.3d at 900). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

---

4      Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). An ALJ is not required to "address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell*, 97 F.4th at 1053. But ALJs must "provide an explanation for how the evidence leads to their conclusions that is sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford the appellant meaningful judicial review." *Id.* at 1054 (internal quotations and citation omitted) (in "shorthand terms," an ALJ must build a "logical bridge from the evidence to [her] conclusion").

**B.     Analysis**

   **1.     Plaintiff's Subjective Statements**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in assessing her subjective statements regarding her symptoms. In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including: the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)). "As long as an ALJ gives specific reasons supported

5

by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279 (citation omitted); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support"). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

Plaintiff testified at the October 28, 2021 hearing that she has pain radiating from her back down to her feet, mostly on the left side. (R. 21, 48). She leans left to right, which takes a toll on her spine and also makes her elbows numb. (R. 21, 48-49). Plaintiff explained that she can only clean dishes in stages, since she normally has to lay down after ten minutes of standing. (R. 21, 45-46). She is unable to do other chores around the house like sweeping, mopping, or vacuuming because pushing back and forth causes her pain, and she doesn't go grocery shopping because pushing a car around would be too painful. (R. 21, 46-47). The longest distance that she is able to walk is roughly a quarter-mile flat. (R. 21, 47). Plaintiff estimated that she can only stand for ten minutes at a time and can sit for only ten minutes before needing to readjust. (R. 21, 47-48). She is unable to put her left arm straight up in the air and cannot extend her hand behind her because of shoulder pain. (R. 22, 49). The maximum weight that she can lift is five pounds (in the form of five-pound weights). (R. 21, 48). Plaintiff is only able to sleep for an hour and a half before waking up and needing to readjust. (R. 22, 50). She has tried physical therapy, which sometimes helps and sometimes makes things worse, and she did not get much relief from a left ulnar nerve decompression. (R. 21, 44, 50).

6

The ALJ concluded that the medical evidence did not support Plaintiff's allegations of pain and limitation resulting from her neck and back impairments. (R. 25-27). In February 2020, x-rays of Plaintiff's cervical spine showed "multilevel degenerative disc disease and spondylosis [with] foraminal stenosis secondary to uncovertebral hypertrophy at C4-C5-C6-C7 bilaterally." (R. 467). Lumbar x-rays showed "a fusion at L5-S1 and some degenerative disc disease of the fusion L4-5." (*Id.*). Pain medicine specialist David Schneider, D.O. noted that an examination of Plaintiff's back revealed "decreased range of motion in all places" and ordered an MRI of her neck, which showed degenerative disc disease and "some spinal stenosis at C5-C6." (R. 23, 453, 467). Approximately five months later, in July 2020, Plaintiff complained of pain in her neck and interscapular region, radiating down her arm. (R. 22, 379). Dr. Schneider noted that Plaintiff had "failed conservative treatment," including medication and physical therapy, and administered a left cervical epidural steroid injection for cervical radiculopathy and stenosis. (R. 22-23, 26, 379-81).

Two weeks later, Dr. Schneider noted that an examination of Plaintiff's lumbar spine revealed decreased range of motion and paraspinal muscle tenderness and that x-rays showed "some degenerative disc disease above [Plaintiff's] previous fusion [at] L5-S1[,] worse at L4-5 and L12" and "[f]usion look[ed] stable." (R. 23, 455). The next month, a lumbar MRI showed "degenerative disc disease at L1-L4 5 motor type changes at L1-L4 5 spinal stenosis at L1-2 and L4-5" and "[a]rtifact due to fusion at L5-S1." (R. 23, 26, 453). On September 10, 2020, Dr. Schneider performed a bilateral L4-5 transforaminal epidural steroid injection, as "all conservative treatments" had failed. (R. 23, 26, 451). Dr. Schneider noted that diagnostic tests showed spondylolysis with an epineurogram

7

and epidurogram, and a physical exam revealed antalgic gait and tenderness to palpation over Plaintiff's paraspinal muscles. (R. 23, 451-52).

On October 12, 2020, Plaintiff reported that the epidural injection had provided short-lived relief, and her lower back pain was slowly getting worse. (R. 23, 26, 449). A physical exam revealed limited range of motion in her neck, and Dr. Schneider diagnosed Plaintiff with: other cervical disc displacement in the high cervical region and cervicothoracic region; radiculopathy in the cervical region and cervicothoracic region; and spinal stenosis in the lumbar region with neurogenic claudication. (*Id.*). Plaintiff received a cervical epidural steroid injection. (R. 23, 26, 449-50). Three months later, on January 26, 2021, a consultative examination performed by Roopa Karri, M.D. showed normal gait and 5/5 strength in Plaintiff's upper extremities and right lower extremity but 4+ strength in her left lower limb, tenderness in the lumbar spine, and loss of lordosis in the cervical spine. (R. 23, 26, 560-65). In April 2021, Plaintiff reported that she was continuing to suffer from bone and joint pain in the neck and lower back and requested a referral to an orthopedist. (R. 24, 26, 709).

On May 5, 2021, x-rays of Plaintiff's lumbar spine showed "evidence of a prior fusion with intervertebral cage placement at L5-S1," "moderate joint space narrowing at L4-5 as well as at L1-L2," and loss of lumbar lordosis. (R. 24, 585). That same day, Plaintiff saw orthopedist Zachary Domont, M.D. A physical exam revealed tenderness along the left side of her spine, forward flexion at thirty degrees with pain, and extension at twenty degrees without pain. (R. 589). On May 18, 2021, Plaintiff underwent a lumbar MRI that showed: "[a]t L4-L5 [] severe loss of height of the intervertebral disc, broad-based posterior and foraminal disc osteophyte complex, worse on the left side"; "mild to

8

moderate bilateral facet hypertrophy at thickening of the ligamentum flavum"; "moderate left-sided neural foraminal narrowing"; "[a]t L3-L4 and L2-L3 [] mild bilateral facet hypertrophy, thickening of the ligamentum flavum without central canal or neural foraminal narrowing"; "[a]t L1-L2 [] moderate loss of height of the intervertebral disc, mild posterior and foraminal disc osteophyte complex, early facet hypertrophy with mild left-sided neural foraminal narrowing"; and "[b]andlike low T1, high T2 signal intensity along the L1-L2 and L4-L5 endplates [] consistent with type I (edematous) endplate change"; (R. 26, 703-04).

The following month, Plaintiff reported to Dr. Domont that she was continuing to have pain and felt like "something is grinding." (R. 24, 580). A physical examination again showed tenderness along the left side of Plaintiff's spine, forward flexion at thirty degrees with pain, and extension at twenty degrees without pain. (R. 24, 26, 580). Dr. Domont noted that Plaintiff's May 18, 2021 MRI results showed that she "has evidence of moderate stenosis with disc herniation at L1-2 and L4-5 as well as evidence of prior L5-S1 intervertebral spacer" and that "[s]he continues to have significant symptoms in the lumbar spine as well as some radicular symptoms." (R. 581-82). Dr. Domont discussed an epidural injection with Plaintiff and that she would likely need surgical intervention, and he referred her to neurosurgery. (R. 24, 582).

Nearly three months later, on September 8, 2021, Plaintiff saw neurosurgeon Jonathan Citow, M.D. for an initial consultation at The American Center for Spine & Neurology and complained of progressive severe lower back pain at a level of 10/10 extending to her left lower extremity. (R. 24, 27, 699). A physical examination showed tenderness to palpation of the lumbar paraspinal musculature, with most of the

9

tenderness in the left sacroiliac joint, as well as limited range of motion in the back secondary to pain. (R. 24, 27, 699). Dr. Citow assessed cervical, sacroiliac, and lumbar pain, as well as sacroiliac inflammation, and administered a left sacroiliac injection. (*Id.*). The next month, on October 11, 2021, Plaintiff reported persistent pain to Alexa Niermeyer, PA-C. (R. 25, 701-02). A physical exam revealed mild tenderness over the lumbosacral region with more significant tenderness over the left sacroiliac joint. (R. 25, 701). Niermeyer assessed sacroiliac inflammation and sacroiliac pain and she recommended an injection. (R. 25, 702). The next day, Plaintiff underwent an initial physical therapy evaluation, during which she complained of lower back pain and neck pain that radiated into her upper extremities. (R. 25, 27, 690). Her physical therapist noted, among other things: mild impairments in flexion and extension; moderate impairments in right and left sidebend; moderate impairments in right and left rotation; severe weakness in deep neck flexor strength and endurance; and tenderness over the cervical paraspinal muscles. (R. 25, 27, 691).

The ALJ concluded that the May 2021 lumbar MRI "showing mild to moderate findings," February 2020 cervical MRI showing degenerative disc disease and "some spinal stenosis," benefits from epidural injections and physical therapy, waxing and waning symptoms but no exacerbations requiring "significant changes to [her] current treatment plan," "generally intact clinical findings,"[5] and Plaintiff's daily activities did not support Plaintiff's complaints of disabling back and neck pain. (R. 27). Plaintiff contends that in making this determination, the ALJ impermissibly "played doctor" by interpreting

---

[5] According to the ALJ, "generally intact clinical findings" meant "reduced range of motion in the lumbar spine, due to pain, and tenderness to palpation in the lumbar spine and left sacroiliac joint, but normal gait, strength, sensation, etc." (R. 27).

the May 2021 lumbar MRI results without any medical input and erroneously concluding that there was no exacerbation of her pain symptoms. (Doc. 11, at 12-13 (citing R. 26-27)). The Court agrees with Plaintiff that this issue requires remand.

"The Seventh Circuit has repeatedly held that an ALJ may not 'play doctor and interpret new and potentially decisive medical evidence without medical scrutiny.'" *Brian M. v. Kijakazi*, No. 22 C 191, 2023 WL 5852193, at *5 (N.D. Ill. Sept. 11, 2023) (quoting *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018)). Furthermore, "[t]he Seventh Circuit has been especially critical of ALJs' attempts to deduce the meaning of complex medical documents, such as MRIs." *Id.* (quoting *Tobias B. v. Kijakazi*, No. 20 C 2959, 2022 WL 4356857, at *6 (N.D. Ill. Sept. 20, 2022)); *Theresa M. v. Saul*, No. 19 C 3135, 2020 WL 7641286, at *5 (N.D. Ill. Dec. 23, 2020) ("[A]s the courts in this circuit have held on numerous occasions, it is for doctors, and not ALJs to interpret x-rays, MRIs, and other raw medical data, even if those scans appear to be mild or unremarkable.").

Here, the ALJ stated that she relied on the May 2021 lumbar MRI "showing mild to moderate findings" and "credit[ed] [Plaintiff's] statements to [the] greatest extent possible" in determining that Plaintiff was capable of performing light work with certain restrictions. (R. 27). But it is unclear how the MRI findings factored into the ALJ's credibility assessment and, ultimately, the RFC. In explaining why she concluded that Plaintiff's statements regarding her neck and back pain are inconsistent with the preponderance of the medical evidence, the ALJ stated:

> Her May 2021 lumbar MRI showed mild to moderate bilateral facet arthropathy and moderate chronic degenerative changes at L4-L5 with left-sided neural foraminal narrowing. *Despite moderate abnormalities documented in the MRI report*, in June 2021, Dr. Domont reported benign findings on physical examination (i.e., tenderness along the left side of the

11

>spine, but otherwise normal findings, including active range of motion, 5/5 strength and distally intact sensation).

(R. 26 (emphasis added and internal citations omitted)). Based on this description, the ALJ appears to have found the "moderate abnormalities" in the May 2021 MRI report to be inconsistent with Dr. Domont's findings the following month. While Dr. Domont documented 5/5 strength and lateral bending without pain at that visit, his treatment notes reflect tenderness along the left side of Plaintiff's spine, forward flexion at thirty degrees with pain, and extension at twenty degrees without pain. (R. 24, 581-82). Dr. Domont also expressly noted that the May 18, 2021 MRI results showed "evidence of moderate stenosis with disc herniation at L1-2 and L4-5 as well as evidence of prior L5-S1 intervertebral spacer" and that Plaintiff "continue[d] to have significant symptoms in the lumbar spine as well as some radicular symptoms." (R. 581-82). It is not clear how these mixed examination findings demonstrate greater functioning than what is reflected in the May 2021 MRI.

      Regardless, the ALJ's description above suggests that she interpreted the MRI findings to be at least somewhat negative. That is, by describing the MRI findings as "moderate abnormalities" and contrasting them with normal exam findings, the ALJ suggests that she may have found that the MRI results lent support to Plaintiff's pain complaints. But the ALJ never explained whether or to what degree the MRI's "moderate abnormalities" supported her conclusion that Plaintiff's pain complaints were not consistent with the medical evidence. Nor did the ALJ offer any explanation as to how the MRI, which she purportedly relied on in determining Plaintiff's functional capabilities (R. 27), factored into the calculus one way or the other. Instead, the ALJ stated only that "considering her May 2021 lumbar MRI showing mild to moderate findings" (among other

12

factors), she "reduced the [RFC] to light [with certain restrictions]." (*Id.*). The Court is thus left to wonder how the May 2021 lumbar MRI findings factored into the ALJ's conclusions regarding Plaintiff's credibility and functioning.

While it is true, as the Commissioner points out, that the ALJ relied on the medical opinions of the state agency medical consultants in crafting the RFC assessment (Doc. 13, at 4, 8, 10), the consultants did not have access to either the May 2021 lumbar MRI results or other treatment records post-dating their opinions. As a result, neither physician considered the significance of those records and their impact, if any, on Plaintiff's functional limitations. Yet the Seventh Circuit has cautioned that an ALJ "must seek an additional medical opinion if there is potential[ly] decisive evidence that postdates the state agency consultant's opinion." *Kemplen v. Saul*, 844 F. App'x 883, 888 (7th Cir. 2021). Here, it is entirely unclear whether the May 2021 lumbar MRI contains "significant, new, and potentially decisive findings [that] could reasonably [have] change[d] the [state agency consultants'] opinion[s]." *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *see also. Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ erred by relying on the conclusions of consulting physicians who were not shown an MRI report that revealed degeneration of the plaintiff's spine, which constituted "new and potentially decisive medical evidence").

The fact that no physician of record weighed in on the May 2021 MRI is especially problematic in this case because the ALJ determined that there was "no documentation of exacerbation of [Plaintiff's] pain symptoms, which would require significant changes to [her] current treatment plan." (R. 27). In support of this conclusion, the ALJ provided no explanation as to how the May 18, 2021 MRI, which revealed findings such as "*severe*

13

loss of height of the intervertebral disc" at L4-L5, compared to Plaintiff's prior diagnostic tests. (R. 703-04 (emphasis added)). Nor was the ALJ qualified to draw such a conclusion on her own. *Stage*, 812 F.3d at 1125 (ALJ erred by evaluating MRIs himself and deciding that they were "similar" to existing evidence instead of consulting a physician); *Antonio T. v. O'Malley*, No. 23 C 2113, 2024 WL 4187979, at *3 (N.D. Ill. Sept. 13, 2024) ("[T]o the extent that the ALJ assessed the MRI herself and determined that the findings were insignificant, such that she could still rely on the consultants' opinions [which preceded the MRI], this was an error in and of itself."); *McHenry*, 911 F.3d at 871 (explaining that "the ALJ was not qualified to assess on his own how the April 2014 MRI results related to other evidence in the record" and that "[a]n ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments") (citation omitted).

Moreover, after Dr. Domont reviewed the May 18, 2021 MRI results, he discussed with Plaintiff "an epidural injection and *likely the need ultimately for surgical intervention*," and referred her to neurosurgery. (R. 582 (emphasis added)). At the October 28, 2021 administrative hearing, Plaintiff confirmed that her doctor had recommended another spinal surgery and that she was scheduled to receive another injection to see if it would help alleviate her pain before attempting surgery. (R. 44, 49)*; see also Randy M. v. Kijakazi*, No. 20 C 3912, 2022 WL 5183894, at *7-8 (N.D. Ill. Oct. 5, 2022) (remanding where the ALJ independently assessed evidence post-dating the agency consultants' opinions, including an MRI, "which revealed degenerative changes in Claimant's spine and prompted his treating physician to recommend surgery"). This is arguably

14

inconsistent with the ALJ's conclusion that there was no need for significant changes to Plaintiff's treatment plan.[6]

The Commissioner contends that the ALJ "did not make an independent medical conclusion when assessing [P]laintiff's course of treatment" and instead "relied upon [P]laintiff's mostly normal objective examination findings and the prior administrative medical findings of the state agency consultants." (Doc. 13, at 10). But the Commissioner does not address the fact that the May 2021 lumbar MRI and other records post-dated the agency consultants' opinions. Instead, the Commissioner maintains that there is no error because no medical provider indicated greater limitations than those found by the ALJ. (*Id.* at 1, 3-4, 10). While it is true that no medical source suggested that any greater restrictions were required, this does not remedy the ALJ's apparent interpretation of and reliance on the May 2021 lumbar MRI results in reaching her conclusions regarding Plaintiff's credibility and functional limitations*. See, e.g.*, Hughes v. Berryhill, No. 17 C 5468, 2018 WL 3647112, at *8-9 (N.D. Ill. Aug. 1, 2018) (ALJ was not qualified to conclude that the claimant's x-ray results were inconsistent with her extreme complaints of pain and limitation); *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) (explaining that "[t]he MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion"); *Brian M.*, 2023 WL 5852193, at

---

[6] There is also some question as to whether diagnoses introduced with or after the May 18, 2021 lumbar MRI may have impacted the opinions of record. Prior to the MRI, Plaintiff's neck and back related diagnoses included: cervical radiculopathy and lumbar radiculopathy; cervical stenosis and lumbar stenosis with neurogenic claudication; spondylolysis; and disc displacement in the cervical and cervicothoracic regions. (R. 22-24). Nearly four months after that MRI, Plaintiff appears to have been first diagnosed with sacroiliac inflammation and sacroiliac pain by Dr. Citow during the initial neurosurgery consultation. (R. 24-25, 699-700, 702).

\*6 ("[I]t is certainly possible that a medical professional could review Claimant's lumbar and cervical spine MRIs – which, again, show anywhere from mild to *marked* degenerative changes at various levels – and find that they provide greater support for Claimant's allegations of disabling pain and limitations than did the ALJ.").

To be clear, the Court does not hold that the May 18, 2021 MRI findings or any subsequent treatment notes were necessarily significant, marked a departure from prior diagnoses or findings, or would have changed the agency consultants' opinions. It may well be that these records warrant no additional restrictions. But the Court declines to draw any assumptions as to whether or how medically complex imaging results and any corresponding diagnoses may bear on Plaintiff's functional limitations. The Court holds only that, given the May 2021 lumbar MRI's finding of severe loss of height of the intervertebral disc at L4-L5 (among other highly technical medical findings that may or may not reflect worsening of Plaintiff's spine), diagnoses of sacroiliac inflammation and pain post-dating the MRI, and indication that surgical intervention would likely be necessary, it is unclear whether the MRI and other records post-dating the agency consultants' opinions may have altered the landscape as to Plaintiff's functional limitations.

In sum, despite the deference owed to the ALJ's subjective symptom determination, the Court finds that, given the above, the ALJ did not provide adequate support for her decision to reject Plaintiff's statements regarding the limiting effects of her neck and back conditions, or build a "logical bridge" between the evidence and this conclusion. *Warnell*, 97 F.4th at 1053. Moreover, the ALJ erred in interpreting the May 2021 lumbar MRI results without medical input and relying on that interpretation to

determine Plaintiff's functional limitations. *Randy M.*, 2022 WL 5183894, at *8; *Brian M.*, 2023 WL 5852193, at *6; *McHenry*, 911 F.3d at 871. These errors preclude a finding that the decision is supported by substantial evidence, and Plaintiff's motion to remand the case is therefore granted.

### 2. Remaining Arguments

Having determined that remand is appropriate, the Court need not address Plaintiff's remaining arguments. However, the ALJ should take the opportunity on remand to review all medical and testimonial evidence as appropriate.

### CONCLUSION

For reasons stated above, Plaintiff's request to reverse or remand the case is granted, and Defendant's Motion for Summary Judgment [12] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: November 1, 2024

SHEILA FINNEGAN
United States Magistrate Judge